UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

IN THE MATTER OF THE SEARCH OF
CELLULAR TELEPHONES BEARING ATF
EVIDENCE BARCODE #PROP-84289,
#PROP-84291, #PROP-84296, AND #PROP-
84299, FURTHER DESCRIBED IN
ATTACHMENT A, CURRENTLY IN THE
CUSTODY OF THE BUREAU OF ALCOHOL,
TOBACCO, FIREARMS AND EXPLOSIVES
IN BURLINGTON, VERMONT

Case No.    2:24-mj-95

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Samuel Brown, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I submit this affidavit in support of a warrant to search four electronic devices

(hereinafter referred to collectively as "the Subject Devices"), recovered in association with

arrests and searches related to an investigation into the August 25, 2024 robbery of the Old North

End Variety Store at 142 North Winooski Avenue in Burlington, VT.  The Subject Devices are

described with greater particularity in Attachment A, attached hereto and incorporated herein.

The requested search warrant would authorize the forensic examination of the Subject Devices

for the purpose of identifying electronically stored data particularly described in Attachment B.

Specifically, law enforcement recovered and currently has secured in Bureau of Alcohol,

Tobacco, Firearms and Explosives ("ATF") custody in the ATF Field Office in Burlington, VT

the following:

        a.   A black Motorola phone and assigned ATF evidence item number PROP-84289

(Subject Device 1), currently in the custody of the ATF's Burlington, VT Field Office.

b. A black Nokia phone, with a cracked screen and assigned ATF evidence item number PROP-84291 (Subject Device 2), currently in the custody of the ATF's Burlington, VT Field Office.

c. A grey Tracphone phone and assigned ATF evidence item number PROP-84296 (Subject Device 3), currently in the custody of the ATF's Burlington, VT Field Office.

d. A black TCL phone and assigned ATF evidence item number PROP-84299 (Subject Device 4), currently in the custody of the ATF's Burlington, VT Field Office.

2. I am a Special Agent (SA) with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), and have been since July of 2014. I am currently assigned to the Burlington, Vermont Field Office in the Boston Field Division. I attended the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia full-time for six-and-a-half months. While at FLETC, I received training in practices and methods of illegal firearm possessors, firearm traffickers, and related federal criminal statutes. As a Special Agent, I have conducted and/or participated in a number of investigations involving state and federal firearm and controlled substance violations. I have interviewed multiple victims, witnesses, and suspects regarding various types of criminal activity. I have also served search warrants for various crimes and have made criminal arrests for firearm and controlled substance violations. Prior to becoming an ATF Special Agent, I was a Law Enforcement Ranger with the United States National Park Service for approximately seven years. As a Ranger, I participated in state and federal investigations involving possession of illegal weapons including firearms and possession of controlled substances. I also conducted numerous investigative stops and probable cause searches of people and vehicles. I participated in physical surveillance operations and in the service of state and federal arrest warrants.

2

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers and witnesses. This affidavit is intended to show there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on the facts as set forth in this affidavit, I submit there is probable cause to believe the Subject Devices described in Attachment A contain evidence of obstruction of commerce by robbery, aiding and abetting thereof and conspiracy to do the same, in violation of 18 U.S.C §§ 1951(a) and 2, as described in Attachment B.

## PROBABLE CAUSE

5.     On August 25, 2024, at approximately 2:46p.m., Burlington Police Department (BPD) officers were dispatched to an armed robbery that had occurred at the Old North End Variety store located at 142 North Winooski Avenue in Burlington, VT. Dispatch reported to responding officers that the store had been robbed "at gun point," and the suspect left the area in a "gun metal gray Volvo with front end damage," which was believed at the time to be occupied by two people.

6.     BPD Officer Bryan Kirby responded to the scene and met with the caller, Alexander Work, who was the store clerk at the time of the incident. Work told Officer Kirby the suspect entered the store, approached the counter, and tapped a handgun on the counter three times. Work said that the suspect stated something to the effect of "come on let's go, give me everything in the register!" and added that the suspect also demanded a pack of Marlboro cigarettes. Work said the suspect pointed the firearm at his chest/abdomen. He said he complied with the suspect's demands because he did not want to be shot and the firearm "scared the shit

3

out of [him]." Work said he gave the suspect the money and the pack of cigarettes and the suspect left the store.

7.      Work described the suspect as a black male between 5'5" and 5'7", wearing a face covering, black gloves, and a black windbreaker with red lettering. He said all he could see were the suspect's eyes. He described the firearm as "pitch black" and guessed it was a Beretta. He estimated the suspect took between $300 and $500. (Store owner, Carrie Rockwood, later confirmed the suspect took $518.00 in U.S. currency and a pack of Marlboro 100 cigarettes).

8.      In reviewing the store's security cameras, officers determined the suspect was a white male, wearing a black and white sweatshirt with "Calvin" written across the front, black pants, and black shoes with white accents. In the video footage, the suspect walked from the area of 284 North Street towards the store at approximately 1:41p.m. The suspect appeared to walk away from a dark colored Volvo with distinct damage to its rear passenger taillight, no rear license plate, and a temporary paper tag in the lower right corner of the rear window. The Volvo then pulled into a driveway and turned around (facing eastbound). The suspect entered the store at 1:42p.m. and drew the firearm from the front of his pants. He then tapped the firearm on the counter several times and pointed it at Work, at which point Work handed him the money and cigarettes, as demanded. The suspect then left the store at 1:43p.m., walked east, and appeared to enter the Volvo. (It should be noted that BPD Sgt. Phil Tremblay confirmed that the store's security system precedes actual local time by approximately one hour, for example, 2:00p.m. in real time is reflected as 1:00p.m. on the store's cameras. As such, the actual times noted above would be 2:41p.m., 2:42p.m., and 2:43p.m. respectively).

9.      On August 26, 2024, at approximately 6:04a.m., BPD Officer Kegan Philbrick located a gray Volvo S60 in the vicinity of 173 North Avenue in Burlington, VT with rear

4

damage and markings consistent with the suspect vehicle noted above. The vehicle's driver was identified as William Nelson who stated that he had been driving on August 25, 2024 in the area of North Street, North Winooski Avenue and North Union Street. Officer Philbrick photographed the vehicle and took no further action at that time. At approximately 12:35p.m., BPD Corporals Kyle Yeh and Jennifer Cousins located the same vehicle in the area of 45 Clark Street in Burlington, VT and seized it pursuant to the robbery investigation. In checking the vehicle's temporary registration and VIN, investigators determined the vehicle was registered to Melissa Rouleau of 157 North Ave, Unit #1, in Burlington, VT. Investigators identified multiple prior law enforcement contacts with Nelson at this address.

10.     In reviewing Nelson and Rouleau's law enforcement history, investigators noted that on August 17, 2024, at approximately 1:34p.m., BPD officers responded to a report of a domestic disturbance at 157 North Ave, Unit #1 involving Nelson and Rouleau. During officers' interaction with Nelson, officers spoke with another white male, later identified as Richard Vardenski, also at the address. Vardenski told officers he was friends with Nelson and had been staying with him since Thursday (understood at the time to mean August 15). AXON body camera footage of the interaction showed Vardenski wearing black Nike sneakers with white accents consistent with those worn by the suspect during the August 25 robbery.

11.     Investigators reviewed additional August 25 video from the Old North End Variety and noted that at 2:11p.m. (1:11p.m on the store's system), Vardenski entered the store and interacted with Work. In this encounter, Vardenski did not have his face covered, was wearing the black Nike sneakers with white accents, and black pants. Vardenski was also carrying a green Dakine backpack and wearing a black Kangol hat.

5

12.     On August 27, 2024, investigators determined that Vardenski had an active

federal arrest warrant for a supervised release violation and, at approximately 5:30p.m., arrested

him as he exited 157 North Ave, Unit #1.  At the time of the arrest, Vardenski was wearing the

same Nike black sneakers with white accents.  During a search incident to arrest of Vardenski's

person, investigators located Subject Device 1.

13.     Later on August 27, 2024, BPD Detective Padric Harnett applied for and was

granted Vermont state search warrants for both the Volvo S60 and 157 North Avenue, Unit #1 to

search for evidence of the robbery.  Upon searching the Volvo, investigators located a piece of

foil from a cigarette package stamped with what appeared to be a Marlboro logo in the driver's

door pocket .  They located Subject Device 3 and Subject Device 4 in an Eastport backpack in

the trunk.  Upon searching 157 North Avenue, Unit #1, investigators located two pairs of black

pants, one pair of grey pants, and a Kangol hat in a laundry bag in the kitchen and a green

Dakine backpack hidden in the bedroom ceiling above the tiles.  In the green Dakine backpack,

investigators located a black and white sweatshirt with "Calvin" written across the front

consistent with the one worn by the robbery suspect, a single black glove, a black facemask, and

a black BB handgun.

14.     In relation to the search warrant execution, Nelson was also arrested for an

unrelated violation of conditions charge.  During a search incident to arrest of Nelson's person,

investigators located Subject Device 2.  Detective Joseph Corrow and Detective Sergeant Phillip

Tremblay read Nelson his *Miranda* warnings which he willingly and knowingly waived.  Nelson

told investigators that he has known Vardenski since childhood and they had renewed contact

about a month earlier.  Nelson stated that, on the day of the robbery, Vardenski had been wearing

the Kangol hat and black sweatpants.  Nelson said he knew there were clothes in the ceiling of

157 North Ave., Unit #1. He said that Vardenski had bragged about having a gun, doing "stick ups," and robbing people and had specifically spoken to him about robbing the Old North End Variety. When shown a photo of the robbery suspect, Nelson identified the suspect as Vardenski and said the "Calvin" sweatshirt had belonged to Rouleau and the black Kangol hat had been Nelson's.

15.     Nelson told investigators that the Volvo S60 is his and the only other person who drives it is Rouleau. He said that on August 25, he had picked up Vardenski in the Volvo in the area of Economic Services on Pearl Street in Burlington, VT. Nelson indicated Vardenski told him to park on North Street near North Union Street and then exited the vehicle. Nelson denied Vardenski re-entering the vehicle immediately after the robbery. Nelson also indicated that Rouleau was driving the Volvo at the time of the robbery in contradiction to his other statements.

16.     . On August 28th, 2024, Det. Harnett and Det. Sgt. Tremblay spoke with Rouleau. Rouleau told investigators that Vardenski had been in the Burlington, VT area for the past three weeks. Rouleau said the green Dakine backpack had originally been hers and she had given it to Vardenski approximately two weeks prior. She said the "Calvin" sweatshirt had also been hers and she had given it to Vardenski approximately one week prior. She said she did not know the backpack had been in the ceiling. Rouleau said that she, Nelson, and Vardenski were all unemployed but she had seen Nelson and Vardenski splitting up money within the last week. She said it looked like a couple hundred dollars in small denominations. She said she had asked for $100.00 and received it.

17.     Vardenski's criminal history notes he is 5'7" (67 inches) tall. On August 28, 2024, I traveled with BPD Detective Padric Harnett to the Old North End Variety and took measurements of the front door. The top of the door is approximately 83 inches. Starting at

7

where the glass starts at the bottom of the door, there are four cross bars on the interior door. The top two bars are distinct with a red and silver tinsel wrapped around them. The top bar (laced with decorative tinsel) sits at approximately 68 inches (5'8") and the next lower bar sits at approximately 56 inches (4'8"). The store footage of Vardenski and the robbery suspect shows both individuals entering and exiting the store consistently beneath the top bar and wearing similar shoes and pants, as noted in the video excerpts below:



Unmasked Image of Vardenski Entering Old North End Variety



Masked Image of Robbery Suspect Entering Old North End Variety

The people depicted in both these photos are wearing apparently identical black/dark gray pants
and black-and-white Nike shoes.

## TRAINING AND EXPERIENCE

18.    Based on my training and experience, I also know the following:

a.  People involved in robberies commonly use cell phones to conduct their illegal
    business dealings and may plan robberies weeks or months in advance.
    Individuals involved in robberies use cell phones: (a) to communicate via voice
    and written text messaging with co-conspirators about their criminal activities; (b)
    to photograph, audio record, and video record themselves possessing or
    communicating about cash, guns, and other contraband; (c) to search the Internet
    to research contraband, laws, and news articles about law enforcement
    investigations (among other search topics); and (d) to map or use GPS apps to
    navigate to and from locations where criminal activity takes place.

b.  Many cell phones have advanced capabilities, including Internet browsing, text
    and e-mail, photography and video storage, social media applications, notes,
    calendars, and data file storage.  People commonly use cell phones to
    communicate with each other via voice, direct connect, text message, and e-mail;
    store valuable data such as names and addresses; obtain and store directions and
    maps; search the Internet; and capture audio, image, and video files.

c.  People who commit robberies frequently use cellular telephones and keep a list of
    names and numbers of co-conspirators in the electronic address books of their
    cellular telephones.  Such cell phones will also carry information in a SIM
    (Subscriber Identity Module) or SD (Secure Digital memory) card, or some other

9

type of electronic storage card or drive, which will reveal that information along
with the number of the cell phone and other information indicating the identity of
the user.

d.  People who commit robberies use cellular telephones to communicate with each
other via voice, direct connect, text message, and e-mail; store valuable data such
as names, addresses, and telephone numbers of co-conspirators; obtain and store
directions and maps; maintain photographs of criminal associates or contraband;
search the Internet; and capture audio, image, and video files.  Records of these
activities are often stored in the memory of cellular telephones.

e.  People who commit robberies may pose for photographs while in possession of
cash and contraband for posting on social media sites or for personal display in
their residences.

f.  People who commit robberies frequently use multiple cell phones in order to
disperse the communications or information relating to their illegal activities to
avoid detection.  They may also have multiple phones because they use different
phones over different time periods to disrupt the ability of law enforcement to
monitor and track their activities continuously across a single device.

g.  People who commit robberies frequently rely on accomplices to help evade
detection.  In particular, robbers may rely on individuals with access to vehicles
or able to drive vehicles to provide transport to and from robberies.  Robbers may
rely on individuals in proximity to robbery locations to provide a location to store
disguises or other materials for the robbery, location to change clothing or store

10

robbery proceeds or a location to retreat after a robbery to avoid heightened law enforcement activity in the robbery vicinity after a robbery.

h. People who commit robberies may also rely on accomplices to help make logistical arrangements to facilitate and evade detection for the robbery activity.

i. People retain cellular telephones for multiple years at a time. When people get a new phone, generally information from the old phone is transferred to the new phone and thus information from a number of prior phones could be located on the most current phone.

j. Friends/co-conspirators communicate with each other about coordinating plans to get together. These communications may include messages received by or sent from the devices, identification numbers and other information contained in their electronic memories, and the records of telephone numbers to which calls were placed and from which calls were received. The device may also contain GPS or similar location information indicating where the devices have traveled as well as photographs or videos.

k. Individuals who commit crimes together or who know about crimes committed by their close associates, may communicate about those crimes through electronic communications that would be stored on a cellular telephone.

l. Persons who participate in the criminal activity frequently use cellular telephones, among other communications devices, to coordinate their unlawful activities and to maintain contact with suppliers and consumers of illegal drugs.

m. Information stored in the memories of these communication devices constitutes evidence of criminal activity. Among other things, the evidence may contain the

telephone numbers assigned to the communication devices, messages received by
or sent from the devices, identification numbers and other information contained
in their electronic memories, and the records of telephone numbers to which calls
were placed and from which calls were received. The device may also contain
GPS or similar location information indicating where the devices have traveled.

n. In short, cell phones are vital instruments to robbers and may contain many
different types of significant evidence of their criminal activities.

## INFORMATION REGARDING ELECTRONIC
## STORAGE AND FORENSIC ANALYSIS

19.     Based on my knowledge, training, and experience, I know that electronic devices
can store information for long periods of time. Similarly, items that have been viewed via the
Internet are typically stored for some period of time on the device. This information can
sometimes be recovered with forensics tools.

20.     *Forensic evidence.* As further described in Attachment B, this application seeks
permission to locate not only electronically stored information that might serve as direct
evidence of the crimes described on the warrant, but also forensic evidence that establishes how
the Subject Devices were used, the purpose of their use, who used them, and when. There is
probable cause to believe that this forensic electronic evidence might be on the Subject Devices
because:

a. Data on the storage medium can provide evidence of a file that was once on the
storage medium but has since been deleted or edited, or of a deleted portion of a
file (such as a paragraph that has been deleted from a word processing file).

12

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

21.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Subject Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that will capture all files and databases stored on the Subject Devices. These files and databases would then be

13

parsed by a digital forensic tool so the data can be reviewed by an investigator. Although some data may contain a date and timestamp, some data may not. Thus, the entire data set must be parsed and reviewed in a digital forensic tool by the investigator to determine how the data applies to the context of the warrant. Much like the execution of a search of a physical location requires observing items to determine if they are evidence of the crimes under investigation, the review of data from the Subject Devices will determine what evidence will be seized as described in Attachment B.

22.     *Manner of execution.*  Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

14

## CONCLUSION

23.     Based on the foregoing, I submit there is probable cause to search the contents of

the Subject Devices, more specifically described in Attachment A, for the evidence delineated in

Attachment B.  Because this warrant seeks only permission to examine the Subject Devices

already in law enforcement's possession, I submit there is reasonable cause for the Court to

authorize execution of the warrant at any time in the day or night.


Dated at Burlington, in the District of Vermont, this __6__ day of September 2024.


SAMUEL BROWN
Special Agent, ATF


Sworn to and subscribed before me this __6th__ day of September 2024.


HONORABLE KEVIN J. DOYLE
United States Magistrate Judge

15